FILED

06/23/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0673

DA 25-0673

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 132

IN RE: KENNETH E. O'BRIEN,
PERSONAL REPRESENTATIVE OF
THE ESTATE OF MAXINE O'BRIEN,
DECEASED, AND THE C. MARK HASH
AND THERESE FOX HASH
REVOCABLE FAMILY TRUST,

      Petitioners and Appellants,

  v.

MONTANA DEPARTMENT OF REVENUE,

      Respondent and Appellee.

| | |
|---|---|
| APPEAL FROM: | District Court of the Eleventh Judicial District, In and For the County of Flathead, Cause No. DV-15-2025-430(B) Honorable Paul Sullivan, Presiding Judge |

COUNSEL OF RECORD:

      For Appellants:

            Therese Fox Hash, Hash, Rudbach, Hutchison & Murray, Kalispell, Montana

      For Appellee:

            Nicholas J. Gochis, Senior Tax Counsel, Montana Department of Revenue, Helena, Montana

                Submitted on Briefs: May 6, 2026

                      Decided: June 23, 2026

Filed:

_____
              Clerk

Justice Katherine M. Bidegaray delivered the Opinion of the Court.

¶1 In 2024, taxpayers Kenneth O'Brien, as personal representative for the estate of Maxine O'Brien, and the Mark and Therese Hash Revocable Family Trust (Hash Family Trust) (collectively, O'Brien), appealed the Montana Department of Revenue's (MDOR) adjusted appraisal of their property for the 2023/24 tax cycle to the Flathead County Tax Appeal Board (CTAB). When CTAB decided the appeal in O'Brien's favor, MDOR appealed to the Montana Tax Appeal Board (MTAB), which reversed CTAB. O'Brien then sought judicial review of MTAB's decision, which the Montana Eleventh Judicial District Court affirmed in July 2025. O'Brien appeals.

¶2 O'Brien raises numerous issues, which we summarize and restate as follows:

1. *Whether MTAB improperly considered the validity and reliability of O'Brien's appraisal for the first time on appeal or conducted a "trial de novo" on that issue.*

2. *Whether MTAB correctly denied O'Brien's motion for summary judgment.*

3. *Whether MTAB correctly construed Admin. R. M. 2.51.307(4).*

4. *Whether "sufficient, relevant information on income" was "made available to the department" under § 15-8-111(5), MCA.*

5. *Whether MTAB correctly reversed CTAB's decision.*

We affirm the District Court's July 15, 2025 order to the extent it concluded MTAB could consider the validity and reliability of O'Brien's appraisal and correctly affirmed MTAB's denial of O'Brien's motion for summary judgment; reverse the District Court's order to the extent it affirmed MTAB's February 2025 merits decisions; reverse MTAB's

February 2025 merits decisions; and reinstate CTAB's April 2024 decisions for Units 130, 132, and 136.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3     O'Brien's case has a complicated factual and procedural history.  The dispositive statutory question, however, is straightforward:  whether, at the time of MDOR's informal review of its 2023/24 assessment, "sufficient, relevant information on income was made available to the department."[1]  If the answer was yes, MDOR had to use the income approach to appraise O'Brien's commercial condominiums.  If the answer was no, MDOR had to use the cost approach.  Section 15-8-111(4), (5)(b), (c), MCA.  With this governing question in mind, we discuss the relevant factual and procedural history of this case.

**The subject property:  PWI Units 130, 132, and 136**

¶4     The subject property, Plaza West I (PWI), is a commercial condominium building located in Kalispell, Montana.  PWI was built in 1973 and has five individual units.  The owners of two units, 126 and 128, were parties to the CTAB and MTAB proceedings below, but these unit owners did not seek judicial review of MTAB's decision and are therefore not parties to this appeal.  The remaining units are:  130 and 132,[2] formerly owned by Maxine O'Brien and now by her estate, and 136, owned by the Hash Family Trust.

---

[1] This case does not require us to decide whether MDOR generally may rely on mass-appraisal models when valuing commercial property.  The narrower question is whether MDOR may treat the absence of model data for commercial condominiums as dispositive when the taxpayer has made income information available that bears directly on the subject property and comparable rental property.

[2] Due to mislabeling while condominiumizing, Unit 132 is sometimes alternatively called Unit 134.

3

Below, the parties consolidated proceedings on all units because everything is materially the same between them except for their square footage. O'Brien used Unit 130 as the prototypical example and so will we.

¶5    Each PWI unit has its own basement with individual access via stairs, and each unit rents the first floor and basement together. The basements generally mirror the upstairs floor plans, and one cannot access the basement of one unit from the basement of another, though some of the basement space is apparently also common area. The basements are not separately rentable, however, because of fire code and access only through the first floor. They are used primarily for storage, though some have mixed-used office space.

¶6    Plaza West II (PWII) is located immediately adjacent to PWI and was built shortly after by the same builder using the same plans and same materials. The only substantive differences between the two buildings are that PWII has more individual units configured slightly differently and is not condominiumized. Like PWI, PWII units also each have full basements accessible only via the first floor and the first floor and basements are rented together.

**MDOR's 2021 assessment on PWI Condominiumization and O'Brien's 2022 CTAB appeal**

¶7    The events underlying this case began when O'Brien condominiumized PWI in 2021. According to O'Brien, in 2020, MDOR appraised PWI using the income approach to valuation, as it always had.[3] But O'Brien's condominiumizing PWI in 2021 triggered a

---

[3] In 2020, MDOR appraised the PWI and PWII buildings each at $697,900.

mid-cycle reappraisal.[4]  Using the income approach, MDOR assigned Unit 130 a potential gross income (PGI) of $20.50/square foot (s.f.)[5] for the first floor only and did not value the basement separately.  Believing the $20.50 PGI was "vastly in excess of what it should be," O'Brien sought MDOR informal review.  On informal review, MDOR reassessed and reduced the first-floor PGI to $15.50 but then, for the first time ever, valued the basement separately at a PGI of $8.75.  When O'Brien asked MDOR to supply the basis for its PGI numbers, MDOR supplied only information on comparable sales, not comparable rents.

¶8      Maxine O'Brien and the Hash Family Trust appealed MDOR's assessments for Units 130, 132, and 136 to CTAB, arguing MDOR could not separately value the basements because they were not separately rentable due to their being accessible only through the upstairs of each unit and not up to fire code.  In 2022, CTAB accepted O'Brien's and the Hash Family Trust's proposed income-approach valuations, which valued the unit first floors only.  The only record before this Court of CTAB's 2022 decisions are three November 16, 2022 letters from the CTAB secretary, one each for Units 130, 132, and 136, describing the decision as "correcting the valuation by adjusting the total valuation" for each unit to the taxpayers' valuation.[6]

---

[4] "Each unit of a condominium project is considered a parcel of real property subject to separate assessment and taxation."  Section 15-8-511(1), MCA; *see also* Title 70, chapter 23 (Montana's "Unit Ownership Act" governing condominiumizing).

[5] PGI is a component of the net operating income calculus and equals the monthly rent times 12 months divided by the "income area" square footage.  All references to PGI throughout are to the potential gross income per square foot.  *See* Admin. R. M. 42.20.108(1)(b) (2005); MDOR's CTAB Exhibit B, pp. 12-13 (calculating PGI based on the "square foot model").

[6] For example, CTAB valued Unit 130 at O'Brien's proposed $145,438, down from MDOR's $474,000.

5

¶9     MDOR admits that CTAB found in O'Brien's favor in 2022 and that it did not appeal CTAB's 2022 decisions.

**The 2023/24 appraisal and O'Brien's request for MDOR informal review**

¶10     After the 2022 CTAB decisions, MDOR assessed PWI for the 2023/24 tax cycle. In June 2023, again using the income approach, MDOR assigned Unit 130 a first-floor PGI of $14.75 and a basement PGI of $9.00.

¶11     In July 2023, O'Brien asked for MDOR informal review under § 15-7-102(3)(a)(ii), MCA.[7]  O'Brien said MDOR's $14.75 first-floor PGI was too high and that MDOR could not separately value the basements under the 2022 CTAB decisions.  Like in 2021, O'Brien asked MDOR to "provide all comparable rental properties and rent used in making the assessment."  *See* § 15-7-102(3)(b), MCA.  MDOR later confirmed that it never provided the taxpayers this requested information.

¶12     To support the taxpayers' proposed income valuations, O'Brien provided MDOR with a "Taxpayers' Appraisal" worksheet showing values for each PWI unit.  O'Brien later submitted a more formal "Report and Appraisal" dated October 27, 2023, and authored by Jeff O'Brien (Jeff), a CPA and Ken and Maxine O'Brien's son.  The appraisal explained its methodology, which calculated value using MDOR's income-approach formula, as

---

[7] Section 15-7-102(3)(a)(ii) prescribes a taxpayer request for "informal classification and appraisal review" of "class four property described in 15-6-134," also known as a Form AB-26.

provided in Admin. R. M. 42.20.108 (2005),[8] and a first-floor-only $12.59 PGI developed from actual PWI rents and rents from the nearly identical PWII.

¶13    On January 17, 2024, MDOR sent O'Brien a determination letter regarding its decision on informal review. MDOR indicated it had adjusted the property value based on a "change to property information." MDOR lead appraiser Andrew Pritchard would later testify that this "change" was to the use code for PWI basements from "office" to "storage." Though the letter also contained a box for "change in valuation method," MDOR did not check it.[9]

¶14    O'Brien obtained the new property record cards for each unit in February 2024. Unit 130's record card showed a reduced appraisal value based on the "cost method." Confusingly, the record card also showed an appraisal value calculated under the "income" method, assigning a first-floor PGI of $14.75 and a basement PGI of $5.50. The total cost-approach and income-approach values were nearly the same amount. MDOR's Pritchard would later testify that the record card showed an income-approach valuation "by default in the form" as "informational for the property owner"; but he also, somewhat contradictorily, testified that MDOR intentionally reduced the basement PGI from $9.00

---

[8] In its simplest form, the income-approach formula calculates property value (V) as the product of "typical property net income" (I) divided by a capitalization or "cap" rate (R), i.e., $V=I/R$. In this formula, I is separately calculated by taking the PGI and subtracting an MDOR vacancy discount and allowable expenses. A vacancy discount is a percentage reduction from income for rental vacancy and uncollected rents. R, the cap rate, reflects an income-producing property's return on investment and is separately calculated by dividing the property's net operating income by its corresponding valid sale price. Admin. R. M. 42.20.108; 42.20.109 (2002).

[9] MDOR's determination letter further explained "how the department calculated the market value of [PWI units] using the cost approach." O'Brien would later claim that the taxpayers' copy of the letter did not contain this language.

to $5.50 "in an effort to recognize the property owner's concerns" about valuing the basements. Despite that the property record cards showed income and cost valuations, Pritchard confirmed MDOR used only the cost approach to value.

**O'Brien's 2024 CTAB appeal**

¶15 O'Brien appealed MDOR's adjusted appraisal to CTAB pursuant to §§ 15-7-102(6) and 15-15-102(4), MCA, on the grounds that the $14.75 first-floor PGI was unsupported and that MDOR could not value the basements separately because of the 2022 CTAB decisions which MDOR did not appeal. O'Brien asked CTAB to reduce the unit values to the taxpayers' valuation amounts as stated in Jeff's appraisal.

¶16 Prior to the scheduled CTAB hearing, MDOR provided O'Brien with a copy of its cost-approach appraisal wherein MDOR identified its rationale for switching appraisal methods.[10] To wit:

> The property owner states the department has overvalued the Plaza West Condos.
>
> In the past, concern was expressed regarding the department's income value method for some of these units. To avoid that concern for 2023, the department has valued the units on the cost approach. The department selected the cost approach and applied appropriate depreciation as evident in the overall price per square foot.
>
> The department recognizes the basement area for each unit does not meet fire code requirements to legally rent as office space. This consideration is evident in the price per square foot . . . for this area. The basement areas are being utilized as either storage or additional office space.

---

[10] O'Brien would later claim that this was the first time the taxpayers learned of MDOR's switching appraisal methods. MTAB and the District Court rejected any claim of surprise, however, because the property record cards, which Ken O'Brien personally received in February 2024, noted that MDOR had adjusted the 2023/24 appraisal values based on the "cost method."

8

The department's valuation is also supported by the sale price of two of the Plaza West units. The sales occurred within six months of the current appraisal date of January 1, 2022.

.   .   .

The department is not required to use income data provided by each property owner to then create an income value for each individual property. This would require an individual appraisal of each property every reappraisal [which] would be time-consuming and an impossible task for mass appraisal valuation.

The department is required to review any income data provided by an individual property owner to determine if an adjustment is necessary based on the department's model data. If sufficient, relevant data is not available, the department shall value condominiums using the cost approach to value.

The income calculation provided by the property owner . . . is not an appraisal. Choosing to use the property owner's reported income values, with some of the department's income model values, overstates expenses and reduces the net operating income below market averages.

Determining market value by using only portions of the department's income calculation model, and then incorporating outside data, is not an acceptable appraisal methodology. . . . The property owner's calculated NOI, divided by the sales price of either of the two sold units, suggests a much lower cap rate than the department's modeled cap rate. . . . The property owner's calculations are not acceptable.

**The April 2024 CTAB hearing**

¶17    Based on MDOR's asserted rationale, the focus of the April 4, 2024 CTAB hearing became whether MDOR had "sufficient, relevant information on income" and therefore had to use the income approach to value PWI's commercial condo units as required by § 15-8-111(5)(b), MCA. MDOR said it lacked sufficient information; O'Brien said MDOR had sufficient information because the taxpayers provided it. Noting that MDOR had, at all times prior to the 2023/24 tax cycle, used the income approach, including after

9

condominiumization in 2021, O'Brien suggested that MDOR switched to the cost approach not for lack of data, but to assess the basements separately and thereby circumvent CTAB's 2022 decisions. O'Brien argued that taxpayer "concerns" could not legitimately justify using the cost approach under § 15-8-111(5), MCA.

¶18 When examined at the hearing, Jeff described himself as PWI's bookkeeper and property manager; he collected rents and paid building expenses. Though not a certified appraiser, Jeff had over 30 years' experience as a CPA, including preparing income-based appraisals.

¶19 Jeff testified as to the basis for his income-approach valuation. He explained that he developed the $12.59 PGI from actual PWI and PWII rents in 2021. Prior to their sale in late 2021, Units 126 and 128 rented for $10.62/s.f. Unit 132 rented for $12.59/s.f. Unit 130, which Jeff rented as office space for his CPA firm, rented for $10.37/s.f.[11] The average rent rates for PWII's units was $12.87/s.f. Units in both buildings were rented under similar terms and all rents included use of the basements.

¶20 The taxpayers separately provided an affidavit from PWII part-owner Dennis Green, which corroborated Jeff's appraisal. Green stated he rented PWII units for an average of $12.87/s.f. based on and competitive with the market and that each unit's rent included use of the basement, which Green treated as an amenity and not a separately rentable space.

---

[11] Unit 136 was owner-occupied in 2021.

¶21 Jeff explained that he used the "highest" $12.59 PGI to calculate each PWI unit's value using MDOR's Rule 42.20.108 income-approach formula. The formula requires inputting values for income, expenses, vacancy discounts, and capitalization rates.[12] Initially, Jeff used MDOR model data for all those values except for income, where he used the $12.59 PGI, and expenses, where he used actual PWI expenses and MDOR model expenses where PWI was lacking. But, when MDOR objected to Jeff's mixing actual and model expense data in his first appraisal (O'Brien's CTAB Exhibit 9), he prepared a second appraisal (O'Brien's CTAB Exhibit 15), which used his $12.59 PGI and MDOR's model data for all other values in the calculus.[13]

¶22 MDOR witnesses, lead appraiser Pritchard and regional manager Dawn Cordone, testified as to why MDOR switched from the income to the cost approach: (1) it lacked model income data for comparable properties; (2) O'Brien's appraisal was neither sufficient nor relevant and was instead unacceptable for several reasons; and (3) the cost approach allowed MDOR to "overcome the property owners' concerns" about valuing the PWI basements under the income approach while still bringing the overall appraisal value in line with the market.

¶23 As for lack of model data, Cordone testified that income data on commercial condominiums in Kalispell was "limited," meaning MDOR could not adequately build a mass-appraisal income model for that property type. This was why, when O'Brien

---

[12] *See supra*, note 8.

[13] This resulted in a revised total value for Unit 130 of $275,889, up from $251,951.

requested MDOR's basis for its June 2023 PGIs, MDOR did not provide that information. Cordone did not, however, explain how MDOR derived the PGIs it used in its 2021 and 2023 income-approach appraisals, leaving Ken O'Brien's testimony that they were based on comparable sales, and not rents, uncontroverted.[14]

¶24 As for O'Brien's appraisal, MDOR did not consider it "sufficient or relevant" for two primary reasons. First, the $12.59 PGI was too low because it did not capture the value of the basements and was the product of bad management practices like renting below market to friends and family. Second, the methodology was flawed because blending PWI's $12.59 PGI with MDOR's model data for all other values in the formula resulted in an appraisal value half of the market value, which MDOR knew precisely from the 2021 sales of Units 126 and 128. MDOR said that it could not accept an appraised value half the market value because that would violate the statutory mandate of § 15-8-111, MCA, that MDOR assess all taxable property at 100% market value. MDOR disagreed with O'Brien that § 15-8-111(4) and (5), MCA, the sections for valuing commercial condominiums, permitted assessment below market value.

---

[14] At the later MTAB hearing, Ken O'Brien tried to get MDOR to answer this question. There, he asked Pritchard directly, "If you didn't have sufficient information to perform an appraisal based on the income approach, how did you use that method?" MDOR objected and Pritchard never directly answered where MDOR came up with the information to perform its June 2023 income approach appraisal; Pritchard did, however, confirm that MDOR never supplied that information to the taxpayers, despite their request.

¶25   MDOR also took issue with Jeff's qualifications and the fact that the appraisal was dated in October 2023.   Notwithstanding these shortcomings, Cordone testified that MDOR fully considered O'Brien's appraisal on informal review but rejected it.

¶26   Finally, as for MDOR's switching appraisal methods to resolve taxpayer "concerns" about the basements, Cordone said the basements had some inherent value, at minimum as storage space.   But, importantly, Cordone agreed that the basements had no separate, individual, or additional value as income-producing property beyond what was already captured in the rent for the first floor.   MDOR's concern, then, was that O'Brien's PGI was too low to reflect the basements' value.   By contrast, Cordone and Pritchard explained that the cost approach, which allowed MDOR to value the basements separately, solved that problem.

**CTAB's April 2024 decision**

¶27   CTAB deliberated on the record.   The board concluded that MDOR's claimed lack of income information was not credible and that the taxpayers had overcome MDOR's presumption of correctness by providing sufficient, relevant income information. Therefore, CTAB resolved the threshold question in O'Brien's favor:  PWI units had to be valued using the income approach under § 15-8-111(5)(b), MCA.   CTAB then compared the taxpayers' and MDOR's income-approach appraisals.   Noting that O'Brien's calculation used all MDOR model data except for income, the board focused on the competing PGIs—i.e., "whose figures to use."

¶28   CTAB decided that O'Brien's $12.59 PGI was "perfectly" corroborated by Green's affidavit describing actual rents from the nearly-identical PWII.  PWII's similar rents also

13

refuted MDOR's claim that PWI's reported rents were based on improper management practices. And, like PWII's rents, PWI's rents reflected use of the basements and therefore captured the basements' values for taxation purposes. Conversely, the board expressed concern that MDOR's $14.75 PGI was based on comparable sales, not comparable rents, as required under MDOR's Rule 42.20.108, and disagreed with assigning any separate PGI to the basements, which had no individual income-producing value.

¶29    After deliberation, CTAB ordered MDOR to apply O'Brien's income-approach valuation, Exhibit 15, which calculated value by using all MDOR model data and O'Brien's $12.59 PGI. CTAB issued conforming written decisions for each PWI unit the next day on April 5, 2024.

**MDOR's appeal to MTAB; Issues presented**

¶30    In May 2024, MDOR appealed CTAB's decision to MTAB pursuant to §§ 15-2-301 and 15-15-104(1), MCA, initially on the broad grounds that CTAB's decision was erroneous and its valuation did not comport with the law. At MTAB's request, MDOR later asserted more specifically that CTAB had erroneously rejected MDOR's cost-approach appraisal upon concluding that sufficient, relevant information on income was made available, mandating use of the income approach under § 15-8-111(5), MCA.

**O'Brien's Motion for Summary Judgment**

¶31    In advance of the MTAB hearing, O'Brien filed a motion for summary judgment, claiming entitlement to judgment as a matter of law on the ultimate question of valuation. Within that ultimate issue, however, lay numerous other questions—including the disputed

threshold question of whether MDOR had sufficient, relevant income information under § 15-8-111(5), MCA. MDOR said the predicate factual question—whether MDOR's model data or O'Brien's property-specific data met the standard—remained disputed, precluding summary judgment.

¶32 The parties also argued over the preclusive effects of the 2022 CTAB decisions which MDOR did not appeal, and specifically whether MDOR could separately value the unit basements. O'Brien said no; MDOR said yes, because Admin. R. M. 2.51.307(4) (2023) creates an exception to the finality of CTAB decisions for circumstances affecting property value, such as periodic reappraisal under § 15-7-111, MCA.

¶33 After full briefing, MTAB concluded that O'Brien was not entitled to summary judgment and denied O'Brien's motion.

**The November 2024 MTAB Hearing**

¶34 At the November 14, 2024 MTAB hearing, Ken O'Brien testified about the 2022 CTAB proceedings and decisions which MDOR did not appeal and about the history of the 2023/24 appraisal leading to the present MTAB appeal.

¶35 Jeff O'Brien testified in conformance with his CTAB testimony regarding how he prepared his appraisal, and specifically, how he developed the $12.59 PGI by using actual PWI and PWII rental income data, which he personally investigated and confirmed. Jeff conceded he was not a certified appraiser but said that his 30-year accounting background qualified him to prepare the income-approach appraisal. Finally, Jeff addressed MDOR's management practices concern, denying that he received any "sweetheart deal" because his

rent for Unit 130 was comparable with other PWI and PWII units and to office rent he paid elsewhere.

¶36 MDOR's lead appraiser Pritchard and regional manager Cordone also testified in conformance with their CTAB testimony, namely that MDOR switched to the cost approach because it lacked sufficient modeling data; it wanted to resolve the taxpayers' concerns that MDOR was overvaluing the basements under the income approach; and the cost-approach valuation "came right in line" with the sale prices for the recently-sold Units 126 and 128. Pritchard and Cordone also offered the same critiques of O'Brien's appraisal: the PGI was too low; the blending methodology was flawed; Jeff was not an appraiser; and the appraisal was not completed within six months of the pertinent valuation date, January 1, 2022.

¶37 First, as for lack of model income data, Pritchard testified that MDOR's mass-appraisal data pool for Kalispell included 49 properties, only one of which was a commercial condominium. That property, however, was not comparable because it did not have a basement and was in an inferior location. MDOR therefore lacked sufficient income data to build a model for that property type.

¶38 Second, as for O'Brien's income data, Pritchard admitted O'Brien provided "income information" for PWI and for the neighboring PWII. But that income information could not be "independently verified" because O'Brien did not provide any tax returns or lease or management agreements; though requested, PWII had also not provided income and expense information; and the only other commercial condo in the data pool was not comparable so MDOR could not use it to verify O'Brien's PGI. In response to MDOR

16

interrogatories and requests for production ahead of the CTAB hearing, O'Brien disclosed that there were no written rental agreements available because they were verbal leases.

¶39    When asked why MDOR did not use the income information O'Brien provided, Pritchard answered that "the data was not reliable" because of "some inconsistencies with the income information." Specifically, O'Brien's "rent rates were below market" and "below what [MDOR] had typically seen for commercial properties." Pritchard again indicated O'Brien's rent rates were discounted for friends and family but did not identify anyone besides Jeff O'Brien as related to PWI ownership. Finally, despite possessing PWI and PWII rent data, Pritchard expressly denied that MDOR "had sufficient information to determine what the PGI was" for PWI or PWII.

¶40    Further, MDOR argued for the first time that PWII was not, as O'Brien claimed, an "identical" property because it was wholly owned and not condominiumized. But the only effect of this distinction, according to Cordone, was that PWI condos and the PWII building had different market values. Cordone admitted, however, that because of their similarities, PWI and PWII may "garner . . . the same market rent."

¶41    Finally, as before CTAB, market value was the primary asserted reason for both rejecting O'Brien's appraisal and switching to the cost approach. Above all other shortcomings, O'Brien's appraisal resulted in unit values that were half their market value, which MDOR found unacceptable and inequitable. By comparison, MDOR said the cost approach solved this problem because it "recognized the reduced utility" of the basement spaces, reduced the overall assessment, "came right in line with the sales prices"

17

of Units 126 and 128, and therefore was "the most appropriate and defensible approach to valuation."[15]

**MTAB's February 2025 decision**

¶42    On February 5, 2025, MTAB issued its decisions, reversing CTAB and adopting MDOR's cost-approach assessments for all PWI units.  As pertinent to our analysis, MTAB made the following conclusions of law:

(1)    "Under Montana law, [MTAB] may hear cases de novo and may affirm, reverse, or modify a CTAB decision."

(2)    O'Brien's "valuation" was not "an appraisal" because "it was performed more than six months after the valuation date" and "because it mixed" actual PWI information with MDOR model information, "result[ing] in an unreliable value."

(3)    "Because MDOR performs mass appraisals, they cannot use a property's actual income and expense data to value that property."  That would require "a separate appraisal for each commercial property" which is "not feasible."

(4)    MDOR "determined it did not have sufficient information to use the income approach to value [PWI] because only one of the voluntary submissions of income information they received was from a commercial condominium," but that property "was in an inferior location and lacked a basement."

(5)    "If MDOR does not receive sufficient information to value a particular commercial property using the income approach, which can happen when there are not enough voluntary submissions of data to develop a model, MDOR must value the property using the cost approach."

---

[15] MDOR's Pritchard testified in support of MDOR's cost-approach appraisal and O'Brien tested Pritchard's assessment methodology on cross-examination.  MDOR modeler Jake Thiesen testified about the land value modeling data underlying the cost-approach appraisal.  O'Brien stipulated, for purposes of the cost approach, that MDOR's model was accurate and met all required standards.

(6)     "If MDOR receives sufficient income information from voluntary submissions in a future cycle," it "may value [PWI] using the income method."

(7)     "Because MDOR only received income information from one commercial condominium during the 2023/24 valuation cycle," MDOR "correctly valued the property using the cost approach."

(8)     MDOR was not "prohibited from valuing the basements" under the 2022 CTAB decisions because, under Admin. R. M. 2.51.307(4), "each valuation cycle stands on its own."

**O'Brien's petition for judicial review of MTAB's decisions on Units 130, 132, and 136**

¶43     In March 2025, O'Brien sought judicial review of MTAB's decisions pursuant to §§ 15-2-303, 2-4-702, and -704, MCA, asking the court to reverse MTAB's decisions and reinstate CTAB's decisions. O'Brien identified four primary issues, whether (1) CTAB erred; (2) MTAB erroneously decided the case based on an issue not presented on appeal; (3) MTAB erroneously tried the case "de novo"; and (4) MTAB erroneously denied O'Brien's motion for summary judgment.

¶44     The District Court identified the "heart of the issue" as whether the income- or cost-approach appraisal method applied. The court concluded that substantial record evidence showed MDOR lacked sufficient, relevant income information and therefore that the "threshold condition" triggering mandatory use of the income approach was not met and that MTAB did not err in adopting MDOR's cost-approach appraisal. From there, the court also concluded that MTAB did not consider new issues beyond the scope of appeal; MTAB had authority under § 15-2-301, MCA, and *Mont. Dep't of Revenue v. Burlington N.*, 169 Mont. 202, 545 P.2d 1083 (1976), to hear appeals from MTAB

19

"de novo"; and MTAB correctly denied O'Brien's motion for summary judgment. The District Court affirmed MTAB's decisions on July 15, 2025. O'Brien appeals.

## STANDARD OF REVIEW

¶45 Section 2-4-704, MCA, sets forth the standards for judicial review of agency decisions, permitting modification or reversal of the agency decision if the petitioner's substantial rights were prejudiced because:

(a) the administrative findings, inferences, conclusions, or decisions were:

(i) in violation of constitutional or statutory provisions;
(ii) in excess of the statutory authority of the agency;
(iii) made upon unlawful procedure;
(iv) affected by other error of law;
(v) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
(vi) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Section 2-4-704(2)(a), MCA.

¶46 Under this standard, agency findings are reviewed for clear error and conclusions of law for correctness. *GBN, Inc. v. Mont. Dep't of Revenue*, 249 Mont. 261, 264, 815 P.2d 595, 596-97 (1991); *Flathead Lakers Inc. v. Mont. Dep't of Nat. Res. & Conservation*, 2023 MT 85, ¶¶ 33-35, 412 Mont. 225, 530 P.3d 769. Agency factual findings are clearly erroneous if unsupported by substantial record evidence, if the agency misapprehended the effect of the substantial evidence, or if review leaves the court with a firm conviction a mistake was made. *Flathead Lakers*, ¶ 34; *Peretti v. Mont. Dep't of Revenue*, 2016 MT 105, ¶¶ 17-18, 383 Mont. 340, 372 P.3d 447.

20

¶47 This Court reviews district court decisions on judicial review of agency decisions applying the same § 2-4-704, MCA, standards. *Flathead Lakers*, ¶ 35; *Peretti*, ¶ 15. Reviewing courts "may not re-weigh the evidence or re-determine witness credibility to achieve a different result." *Peretti*, ¶ 17; § 2-4-704(2), MCA. We must review the entire administrative record, giving deference to agency findings only if not clearly erroneous and to agency determinations only insofar as they are lawful and the product of consistent, rational, well-supported, and cogently-explained decision-making. *DeBuff v. Mont. Dep't of Nat. Res. & Conservation*, 2021 MT 68, ¶ 24, 403 Mont. 403, 482 P.3d 1183; *Puget Sound Energy, Inc. v. State*, 2011 MT 141, ¶¶ 15-16, 361 Mont. 39, 255 P.3d 171.

¶48 When reviewing decisions of the Montana Tax Appeal Board, we recognize that the board "is particularly suited for settling disputes over the appropriate valuation of a given piece of property." *O'Neill v. Mont. Dep't of Revenue*, 2002 MT 130, ¶¶ 22-23, 310 Mont. 148, 49 P.3d 43; *Peretti*, ¶¶ 14, 17-18. Because tax assessments are within MTAB's specific expertise, we will uphold them "unless there is a clear showing of an abuse of discretion." *O'Neill*, ¶ 23; *Dep't of Revenue v. Grouse Mt. Dev.*, 218 Mont. 353, 355-56, 707 P.2d 1113, 1115 (1985). An abuse of discretion occurs where MTAB misapplies the controlling law or exercises discretion based on clearly erroneous findings of fact. *See Bessette v. Bessette*, 2019 MT 35, ¶ 13, 394 Mont. 262, 434 P.3d 894; *accord Flathead Lakers*, ¶ 34 (agency decisions are arbitrary or capricious if at odds with the information gathered or the product of internally inconsistent analysis).

¶49 Agency interpretations, applications, and conclusions of law are reviewed de novo for correctness. *Flathead Lakers*, ¶ 35. While we afford an agency's interpretation of

21

statutes it administers "respectful consideration," administrative interpretations are not binding on this Court. *Mont. Power v. Mont. PSC*, 2001 MT 102, ¶¶ 24-27, 305 Mont. 260, 26 P.3d 91.

¶50 This appeal does not require us to substitute our judgment for MTAB's appraisal expertise or to reweigh competing valuation evidence. Rather, it requires us to determine whether MTAB and the District Court correctly construed and applied the statutory threshold in § 15-8-111(5), MCA. MTAB's valuation expertise receives deference when it weighs evidence under the correct legal standard. It does not receive deference when it inserts a requirement into the statute that the Legislature did not include or when it misapprehends the legal effect of undisputed income information made available to MDOR through informal review and appeal. *See* § 2-4-704(2), MCA; *Peretti*, ¶¶ 15, 17; *Flathead Lakers*, ¶¶ 34-35; *Mont. Power*, ¶¶ 24-27.

## DISCUSSION

¶51     *1. Whether MTAB improperly considered the validity and reliability of O'Brien's appraisal for the first time on appeal or conducted a "trial de novo" on that issue.*

¶52 Issue framing became an issue here when MDOR appealed to MTAB. However, as stated above, the threshold dispositive question before CTAB and MTAB was the same: whether "sufficient, relevant information on income [was] made available to the department." If yes, MDOR had to use the income approach; if not, MDOR had to use the cost approach. Section 15-8-111, MCA, does not define "sufficient, relevant information on income." That left plenty of room for argument as to what type, quantity, and quality of information satisfied the standard. Both parties argued within that space.

22

**1. O'Brien's claims regarding MTAB's consideration of the taxpayers' appraisal**

¶53 Here, as before the District Court, O'Brien contends that MTAB improperly considered the "validity and reliability" of Jeff O'Brien's appraisal for the first time on appeal. From this premise, O'Brien argues that (1) the taxpayers were denied their constitutional right to have the issue of the validity/reliability of O'Brien's appraisal decided at the local government level;[16] (2) MTAB lacked jurisdiction to hear any claims regarding the validity/reliability of O'Brien's appraisal because MDOR was never aggrieved by any CTAB decision on that issue since it never considered it; and (3) MTAB impermissibly conducted a "trial de novo" on the validity/reliability of O'Brien's appraisal because that issue was never previously presented to CTAB.

¶54 O'Brien is incorrect that the validity and reliability of Jeff O'Brien's appraisal was never at issue before CTAB. The CTAB record shows Jeff's appraisal—including its PGI value, methodology, and overall conclusion—was contested as part of the broader statutory question whether sufficient, relevant income information had been made available to MDOR. O'Brien's entire claim was that MDOR had to use the income approach because the taxpayers' income information met the § 15-8-111(5)(b), MCA, standard. MDOR disagreed, claiming O'Brien's information was not sufficient or relevant because (1) the PGI was too low because it did not capture the basements' value and was the product of

---

[16] Article VIII, Section 7, of the Montana Constitution provides: "The legislature shall provide independent appeal procedures for taxpayer grievances about appraisals, assessments, equalization, and taxes. The legislature shall include a review procedure at the local government unit level."

bad management practices; (2) the appraisal utilized a flawed methodology; and (3) O'Brien's numbers yielded a value at half the market. Thus, although the parties framed the issue differently at different stages, the evidentiary dispute over O'Brien's income information was not new before MTAB.

¶55 True, MDOR expanded its arguments before MTAB. There, it argued for the first time that O'Brien's income information was also unreliable because it could not be independently verified, either with property-specific documentation or MDOR's model data, and because PWII was not actually a comparable property because not condominiumized. But these arguments did not reflect a new or changed legal theory; they were merely more developed arguments within the scope of MDOR's original claim that O'Brien's information did not meet the § 15-8-111(5), MCA, standard. *See State v. Montgomery*, 2010 MT 193, ¶ 12, 357 Mont. 348, 239 P.3d 929 (parties are permitted on appeal "to bolster their preserved issues with additional legal authority or to make further arguments within the scope of the legal theory [previously] articulated").

¶56 Ultimately, for reasons we will discuss below, the "validity and reliability" of O'Brien's appraisal was not dispositive of the ultimate legal question of whether MDOR had sufficient, relevant income information under § 15-8-111(5), MCA. The quality of O'Brien's appraisal could bear on the weight assigned to the taxpayers' proposed valuation. It did not, however, supply the legal standard for determining whether MDOR was relieved of the statutory obligation to use the income approach once sufficient, relevant income information had been made available. Additionally, no defect in the appraisal, including whether it independently satisfied § 15-2-301(3)(a), MCA, requires MTAB to disregard

24

the income information contained in and supporting the appraisal for purposes of § 15-8-111(5), MCA. Section 15-2-301(3)(a), MCA, governs mandatory consideration of an independent appraisal meeting specified requirements; it does not define the broader category of "sufficient, relevant information on income" under § 15-8-111(5), MCA.

¶57 Even though not dispositive of the ultimate issue, the question of the validity and reliability of O'Brien's appraisal was sufficiently encompassed within the valuation dispute presented to CTAB. Accordingly, we hold that MTAB did not improperly consider the validity/reliability issue for the first time on appeal.

**2. O'Brien's "trial de novo" claim**

¶58 Because the validity and reliability of O'Brien's appraisal was properly before MTAB on appeal, MTAB did not conduct a "trial de novo" by hearing additional testimony on that issue as O'Brien contends. Under § 15-2-301(2)(b), MCA, MTAB was authorized to "hear further testimony" beyond the CTAB record on appeal. However, due to apparent confusion in this area, we address and clarify MTAB's appellate authority.

**Statutes governing MDOR informal review, CTAB appeal, MTAB appeal, and judicial review**

¶59 "[O]nce each valuation cycle," a taxpayer "dissatisfied with [MDOR's] appraisal as it reflects the market value of the property as determined by [MDOR] . . . may request an informal classification and appraisal review" and "reduction in the appraised value" of class four commercial property. Section 15-7-102(3)(a)(ii), MCA. On informal review, MDOR "may consider . . . relevant information presented by the taxpayer in support of the taxpayer's opinion as to the value of the property." Section 15-7-102(3)(e), MCA. MDOR

25

must consider a taxpayer's "independent appraisal" if it meets Montana's Board of Real Estate Appraisers' standards and was completed within six months of the valuation date. If MDOR elects not to use the taxpayer's appraisal, it must tell the taxpayer why it did not. Section 15-7-102(3)(e), MCA.

¶60 A taxpayer aggrieved by MDOR's decision on informal review under § 15-7-102(3), MCA, "has the right to first appeal to the county tax appeal board and then to the Montana tax appeal board." Section 15-7-102(3)(f), (6), MCA. Appeal to CTAB from an MDOR decision under § 15-7-102(3)(a)(ii) and (6), MCA, is permitted once during each valuation cycle. Section 15-15-102(3), (4), MCA. On appeal,

> [a] county tax appeal board . . . may consider the actual selling price of the property, independent appraisals of the property, negative property features that differentiate the subject property from the department's comparable sales, and other relevant information presented by the taxpayer as evidence of the market value of the property.

Section 15-7-102(6), MCA; *see also* §§ 15-15-103(1), -104(1), MCA (the taxpayer must appear at hearing and CTAB must examine the taxpayer under oath). Like MDOR, CTAB must consider a taxpayer's independent appraisal if it comports with the Board of Real Estate Appraisers' standards and was conducted within six months of the valuation date. And, like MDOR, if CTAB elects not to use the taxpayer's appraisal, it must explain why. Section 15-15-103(3), MCA.

¶61 "In connection with an appeal," CTAB "may change any assessment or fix the assessment at some other level." Section 15-15-101(6), MCA. If CTAB "determines that an adjustment should be made, the department shall adjust the base value of the property in accordance with the board's order." Section 15-7-102(6), MCA.

26

¶62 If aggrieved by CTAB's decision, a taxpayer who has "exhausted the remedies available through the county board" may appeal to MTAB under § 15-2-301, MCA. Sections 15-15-103(1), -104(1), 15-7-102(6), 15-2-301(1)(b), (e)-(f), -201(1)(b), (3), MCA; *compare* §§ 15-2-302, -201(1)(c), 15-7-102(6), MCA (direct appeal to MTAB of certain classes of MDOR final decisions). MDOR may also appeal an adverse CTAB decision to MTAB. Sections 15-15-104, 15-2-301(1)(b), MCA. Once appealed, MTAB must set the matter for hearing. Section 15-2-301(1)(e)-(f), MCA.[17]

¶63 On appeal, CTAB's "record of the proceedings, including the electronic record of all testimony and the deliberation of the county tax appeal board, must be forwarded, together with all exhibits," to MTAB. Section 15-15-103(1), MCA. MTAB "may require the county board to certify to it the minutes of the proceedings resulting in the action and all testimony taken in connection with its proceedings." Section 15-2-301(2)(a), MCA. MTAB "may, in its discretion, determine the appeal on the record if all parties receive a copy of the [CTAB] transcript and are permitted to submit additional sworn statements, or [MTAB] may hear further testimony." Section 15-2-301(2)(b), MCA; *see also* § 15-2-201(2), MCA (MTAB power to subpoenas witness and administer oaths "in any investigation").[18]

---

[17] *But see* § 15-2-301(8), MCA (permitting MTAB "informal review" by taxpayer election for certain property classes).

[18] Or "[f]or the purpose of expediting its work, the Montana board may refer any appeal to one of its members or to a designated hearings officer. The board member or hearings officer may exercise all the powers of the Montana board in conducting a hearing and shall, as soon as possible after the hearing, report the proceedings, together with a transcript or a tape recording of the hearing, to the Montana board. The Montana board shall determine the appeal on the record." Section 15-2-301(2)(d), MCA.

¶64 Identical to CTAB appeals, § 15-7-102(6), MCA, provides that MTAB "may consider the actual selling price of the property, independent appraisals of the property, negative property features that differentiate the subject property from the department's comparable sales, and other relevant information presented by the taxpayer as evidence of the market value of the property." And, like CTAB, MTAB must consider a taxpayer's independent appraisal if it meets the Board of Real Estate Appraisers' standards and was conducted within six months of the valuation date; if MTAB does not use the taxpayer's appraisal, it must state why. Section 15-2-301(3)(a), MCA.

¶65 On an appeal from CTAB, MTAB "is not bound by common law and statutory rules of evidence or . . . discovery and may affirm, reverse, or modify a decision." Section 15-2-301(5), MCA. If MTAB "determines that an adjustment should be made, the department shall adjust the base value of the property in accordance with the board's order." Section 15-7-102(6), MCA; *see also* § 15-2-301(7), MCA (providing that §§ 15-6-134 and 15-7-111, MCA, "may not be construed to prevent the department from implementing an order to change the valuation of property"); § 15-6-134, MCA (taxation of class four properties); § 15-7-111, MCA (periodic reappraisal).

¶66 MTAB's decision "is final and binding on all interested parties . . . unless reversed or modified on judicial review." Sections 15-2-301(6); 15-7-102(6), MCA. Any party aggrieved by MTAB's decision may petition for judicial review pursuant to § 15-2-303, MCA, and the Montana Administrative Procedure Act (MAPA). Sections 15-2-301(5)-(6), -303, MCA; *compare* § 15-1-406(1), MCA (actions for declaratory judgment).

28

**MTAB's appellate authority under §§ 15-2-301 and -302**

¶67    *Burlington N.* and *Puget Sound* describe MTAB's authority to hear direct appeals from MDOR assessment decisions. *Burlington N.*, however, was decided before the Legislature specifically provided for direct appeals from MDOR to MTAB, and therefore required application of § 84-709, RCM (1947) (1973), a § 15-2-301, MCA, precursor which provided only for appeals from county tax appeal boards to MTAB.[19]  By *Puget Sound*, the Legislature had enacted § 15-2-302, MCA, and therefore expressly provided for direct appeals to MTAB from MDOR decisions.[20]

¶68    In *Puget Sound*, we explained the distinct procedural effects of §§ 15-2-301 and -302, MCA. Section 15-2-302 provides for a direct appeal from certain MDOR decisions to MTAB. These appeals are governed exclusively by MAPA's contested case provisions. Section 15-2-302(5), MCA; *Puget Sound*, ¶¶ 26, 28 (citing §§ 2-4-601 through -631, MCA).  MTAB is specifically authorized on § 15-2-302 direct appeal to "serve as a fact-finding tribunal" in a dispute between MDOR and a taxpayer because no contested-case record has been previously developed. *Puget Sound*, ¶¶ 29, 35.  This is

---

[19] We were therefore required to read the not-quite-on-point § 84-709, RCM, in context of the Legislature's 1973 scheme to determine the bounds of the newly-created MTAB's "quasi-judicial" authority to directly review MDOR assessment decisions.  Accordingly, in holding that MTAB could conduct de novo review of MDOR decisions on direct appeal, we considered and applied § 84-702, RCM (1947) (1973) (creating MTAB under the Department of Administration); § 84-708, RCM (1947) (1973) (MTAB powers and duties (today's § 15-2-201, MCA)); various "executive reorganization statutes"; and various MAPA provisions. *Burlington N.*, 169 Mont. at 210-14, 545 P.2d at 1087-90.

[20] Our *Burlington N.* holding that § 84-709, RCM, authorized de novo review of MDOR decisions on direct appeal was therefore effectively superseded by enactment of § 84-709.4, RCM (1973) (1977) (now § 15-2-302, MCA). *Compare Burlington N.*, 169 Mont. at 213-14, 545 P.2d at 1090.

why, citing *Burlington N.*, we said in *Puget Sound* that a direct appeal from an MDOR final decision is akin to a "trial de novo." *Puget Sound*, ¶ 30.

¶69 By contrast, § 15-2-301, MCA, provides for appeals from county tax appeal board decisions, where, unlike in § 15-2-302, a contested-case record has been developed. In appeals under § 15-2-301, MTAB serves less as a fact-finding tribunal and "more like a typical appellate body." *Puget Sound*, ¶¶ 27-29. As such, MTAB cannot hear a CTAB appeal unless the taxpayer has exhausted all county-board remedies, including appearing before the county board and testifying under oath, and until the CTAB record has been transmitted to MTAB for appeal. Sections 15-15-103(1), -104(1), 15-7-102(6), 15-2-301(1)(b), (e)-(f), -201(1)(b), (3), MCA.

¶70 This is not to say, however, that MTAB is strictly limited by the CTAB evidentiary record or owes CTAB's decision any particular deference. Instead, Montana law expressly provides that MTAB may decide a § 15-2-301 appeal on the record developed in the CTAB proceedings, additional sworn statements, and further testimony. *Puget Sound*, ¶ 27; § 15-2-301(2)(b), MCA; *accord* § 15-2-201(1), (2), MCA. Section 15-2-201, MCA, affirms this principle, empowering MTAB to summon witnesses to appear and testify; compel production of records, books, papers, and documents; and administer oaths "in any investigation." Section 15-2-201(1)(b), (2), MCA. So does § 15-7-102(6), MCA, which grants MTAB and CTAB identical authority to consider the taxpayer's evidence and order an adjustment to value where warranted. The distinction is that MTAB has the final authority to "affirm, reverse, or modify any decision," subject only to judicial review. Sections 15-2-301(5), (6), 15-7-102(6), MCA.

¶71 Citing *Burlington N.* and *McDunn v. Arnold*, 2013 MT 138, ¶ 22, 370 Mont. 270, 303 P.3d 1279, MTAB concluded it had authority under Montana law to "hear appeals de novo . . . [by] trying the matter anew, as if it had not been heard before and no decision had been previously rendered." The District Court relied on *Burlington N.* to affirm MTAB's "de novo" procedures here. We clarify that *Burlington N.* and its holdings apply to direct appeals from MDOR to MTAB under § 15-2-302, MCA, not appeals from county tax appeal boards to MTAB under § 15-2-301, MCA, like the appeal at issue here. Direct appeals from MDOR assessment decisions lack a developed, adversarial record or an independently adjudicated decision. MTAB may therefore conduct a "trial de novo" only on direct appeal and only to the extent there has not been any previous contested-case proceeding or evidentiary development. *Puget Sound*, ¶¶ 26-30, 36-37; *accord Burlington N.*, 169 Mont. at 214-15, 545 P.2d at 1090.

¶72 By contrast, nothing in the plain language of § 15-2-301, MCA, authorizes a similar "trial de novo" on appeal from a county tax appeal board decision. True, § 15-2-301, MCA, authorizes MTAB to "hear further testimony" on appeal from a county tax appeal board, but that authority operates within an appellate structure that begins with local review and a transmitted county-board record. Sections 15-15-103(1), -104(1), 15-2-301(2), MCA. Thus, MTAB may supplement the record on issues encompassed within the county-board proceeding. The exhaustion requirement, the taxpayer's appearance and sworn testimony before CTAB, and the mandatory transmission of the CTAB record—including testimony, exhibits, and deliberations—confirm that an appeal under § 15-2-301, MCA, is not an unrestricted original proceeding. *See* §§ 15-15-103(1), -104, 15-2-301(2), MCA. Though

31

Montana law is silent regarding deference to CTAB decisions, it does not follow that § 15-2-301, MCA, grants MTAB unfettered authority to try a tax assessment case "de novo" on appeal from a county tax appeal board as if the matter had never been previously considered. When reviewing a county tax appeal board decision under § 15-2-301, MCA, MTAB acts as a quasi-appellate body with statutory authority to supplement the record and is limited to issues properly preserved for appellate review.[21] MTAB may supplement the record; it may not erase the county-board proceeding.

¶73 O'Brien's argument on this point is very specific and therefore may be narrowly decided. O'Brien concedes that § 15-2-301, MCA, permits MTAB to hear additional evidence that "supplements or augments evidence relating to an issue" previously raised. The only issue, however, that O'Brien identifies as not having been previously raised was the validity and reliability of Jeff O'Brien's appraisal. As discussed above, that issue was highly contested on the CTAB record. Therefore, MTAB did not exceed its authority under § 15-2-301, MCA, when hearing further testimony from both parties on that issue.

¶74 *2. Whether MTAB correctly denied O'Brien's motion for summary judgment.*

¶75 Summary judgment is appropriate where the moving party establishes that there are no genuine issues of material fact and entitlement to judgment as a matter of law. M. R. Civ. P. 56(c)(3). All reasonable inferences that can be drawn from the offered

---

[21] Our statements here today do not undermine the principle that MDOR tax assessments enjoy a presumption of correctness. *See Peretti*, ¶ 14; *Solem v. Mont. Dep't of Revenue*, 2024 MT 217, ¶¶ 17, 19-21, 418 Mont. 176, 557 P.3d 919. Deference to MDOR's assessment remains, but only where MDOR has promulgated and applied an administrative rule covering the subject tax matter and MDOR's rule and application thereof is not arbitrary, capricious, or otherwise unlawful. Section 15-2-301(5), MCA; *accord Burlington N.*, 169 Mont. at 214-15, 545 P.2d at 1090.

evidence should be drawn in favor of the party opposing summary judgment. *Knucklehead Land Co. v. Accutitle Inc.*, 2007 MT 301, ¶ 24, 340 Mont. 62, 172 P.3d 116. Fact questions may be determined as a matter of law only where reasonable minds could not differ. *Schmidt v. Wash. Contractors Group, Inc.*, 1998 MT 194, ¶ 6, 290 Mont. 276, 964 P.2d 34. We review lower court decisions on summary judgment de novo, applying the same M. R. Civ. P. 56(c)(3) standards to the entire Rule 56 record. *Kipfinger v. Great Falls Obstetrical & Gynecological Assocs.*, 2023 MT 44, ¶ 43, 411 Mont. 269, 525 P.3d 1183.

¶76 Here, whether MDOR had "sufficient, relevant information on income" triggering mandatory application of the income approach was the central dispute in this case. It presented a mixed question of law and fact, requiring a predicate factual determination whether MDOR's or the taxpayers' information was "sufficient" and "relevant." *See, e.g.*, *Stop Overspending Mont. v. State*, 2006 MT 178, ¶ 10, 333 Mont. 42, 139 P.3d 788 (mixed questions of law and fact exist "when the historical facts of a case are admitted or established, the applicable law is undisputed, and the issue is whether the facts satisfy the statutory standard"); *Merila v. Burke*, 2024 MT 4, ¶ 11, 415 Mont. 24, 541 P.3d 770. What type, quantity, and quality of information met the § 15-8-111(5) standard remained a disputed question of material fact.

¶77 And even if, arguendo, sufficient, relevant income information was available and MDOR had to use the income approach, the parties disputed which income values were appropriate. From the beginning, O'Brien claimed that MDOR's $14.75 first-floor PGI was too high because it was based on comparable sales, not rents; that MDOR's separate $5.50 basement PGI was improper after the 2022 CTAB decisions; and that MDOR failed

to provide any evidentiary basis for either PGI. By contrast, MDOR claimed the taxpayers' PGI was unsupported by any documentation, the product of bad management practices, and did not reflect market value. O'Brien countered that the $12.59 PGI was a "justifiable market rent" because supported by Green's affidavit regarding PWII's similar rents and lease terms; no one besides Jeff O'Brien was friend or family; and lease agreements were verbal, not written.

¶78 At the summary judgment stage, it remained contested which PGI was an appropriate income value. This and other fact questions, upon which reasonable minds could disagree, were not appropriate for resolution as a matter of law on summary judgment. MTAB correctly denied O'Brien's motion.

¶79 *3. Whether MTAB correctly construed Admin. R. M. 2.51.307(4).*

¶80 It is undisputed on the particular record in this case that, in 2021, MDOR assessed PWI on condominiumization using the income approach, assigning separate PGIs for the first floors and basements. It is also undisputed that, when O'Brien appealed MDOR's 2021 appraisal, CTAB adopted O'Brien's valuations for PWI Units 130, 132, and 136, which used a first-floor-only PGI and did not separately value the basements. It is also undisputed that MDOR did not appeal CTAB's 2022 decisions.

¶81 When MDOR appraised PWI units for the 2023/24 tax cycle, it again used the income approach, assigning separate PGIs for the first floors and basements. As pertinent, O'Brien argued from the outset that MDOR could not assign any separate income value to

34

the basements because CTAB's 2022 decisions rejected that exact practice.[22] MDOR denied that O'Brien could meet the elements of res judicata or collateral estoppel. But, importantly, MDOR conceded—both in writing in its cost-approach appraisal and under oath before the county board—that PWI's basements had no individual income-producing value because they were not separately rentable due to access and fire code restrictions.[23] This concession did not go unnoticed: upon deciding that the income approach applied, CTAB rejected MDOR's income-approach valuation partly because it attributed a $5.50 PGI to the basements, which the board found problematic given the party consensus that the basements were not separately rentable, income-producing spaces.

¶82    The preclusion issue became more nuanced when MDOR switched from the income to the cost approach. According to O'Brien, the 2022 CTAB decisions precluded MDOR from separately valuing the basements *under the income approach*. Therefore, switching to the cost approach, among other things, permitted MDOR to value the basements separately and thereby effectively avoid the adverse 2022 CTAB decisions which MDOR, for reasons unknown, never appealed. O'Brien argued throughout that this was partly why MDOR switched appraisal methods: as pretext.

---

[22] O'Brien also argued that the basements could not be assigned any PGI because they were not separately rentable due to access and fire code.

[23] MDOR's Cordone agreed on the CTAB record that the basements could not be separately rented due to access and fire code and thus did not have separate income-producing value. She disagreed, though, that the basements had no value at all and that O'Brien's $12.59 PGI appropriately captured their value as, at minimum, storage space.

¶83 On appeal from CTAB, MTAB concluded that MDOR lacked sufficient, relevant income information and therefore had to use the cost approach to value. But MDOR's cost-approach appraisal assigned separate values to PWI units' first floors and basements. Accordingly, MTAB further concluded that the 2022 CTAB decisions did not prevent MDOR from valuing the basements because statutory reappraisal defeated any preclusive effect of CTAB's prior decisions under Admin. R. M. 2.51.307(4). This conclusion freed MTAB to adopt MDOR's cost-approach appraisal.

¶84 On judicial review, O'Brien challenged MTAB's conclusion that statutory reappraisal defeated the finality of unappealed CTAB decisions, arguing MTAB incorrectly construed Rule 2.51.307(4). The District Court, however, did not address this claimed error.

¶85 O'Brien forwards the same arguments on appeal, disagreeing that Rule 2.51.307(4) can be read to allow MDOR to periodically reassess PWI's basements in perpetuity despite not appealing the 2022 CTAB decisions. MDOR counters that the 2022 CTAB decisions have no preclusive effect because (1) CTAB's authority is limited to only the specific assessment under review;[24] (2) preclusion doctrines cannot be applied to permit "a citizen board's" decision for a prior tax year to "functionally exempt[]" part of a property from

---

[24] MDOR cites § 15-15-101(6), MCA, as authority for this claim. This section, which deals primarily with setting hearings and publishing notice, says only that "in connection with an appeal, the county tax appeal board may change any assessment or fix the assessment at some other level." Nothing in this section, or any other tax statute that we could find, limits the *binding* effect of a CTAB decision on appeal to a specific tax cycle or a specific MDOR assessment.

taxation for future years;[25] and (3) CTAB decisions "are not binding in subsequent reappraisal cycles" under Admin. R. M. 2.51.307(4).

¶86 As stated, when reviewing a District Court's decision on judicial review of an agency decision, like MTAB's decision here, we apply the same § 2-4-704, MCA, standards of review. This includes reviewing the agency's conclusions and applications of law de novo for correctness. Section 2-4-704(2)(a), MCA; *Flathead Lakers*, ¶ 35; *Peretti*, ¶ 15. Because O'Brien alleged MTAB interpretive error on the preclusion issue, we address it even though the District Court did not.

¶87 First off, neither party appears to recognize that the 2022 CTAB decisions pertain only to *income-approach* valuations, since the decisions there adopted O'Brien's income-approach appraisal, which did not assign a separate PGI for the basements, and rejected MDOR's income-approach appraisal, which assigned a separate PGI for the basements. The 2022 decisions would therefore have no preclusive effect on *cost-approach* valuations like the one MDOR used and MTAB ultimately adopted here. However, because we ultimately conclude that MDOR was required to use the income approach under § 15-8-111(5), MCA, *infra*, we also conclude that, in doing so,

---

[25] We note that Admin. R. M. 2.51.403(2) (2023) applies the identical "citizen board's" standards to the Montana Tax Appeal Board: "With respect to taxable real property and improvements thereon, the decision of the Montana Tax Appeal Board shall be final and binding unless reversed or modified by the district court upon judicial review. If the decision of the Montana Tax Appeal Board is not reviewed by a district court, it is final and binding for subsequent tax years unless there is a change in the property itself or circumstances surrounding the property which affects its value. Statutory reappraisal by the Department of Revenue pursuant to 15-7-111, MCA, is a circumstance affecting the value of real property and improvements thereon."

the 2022 CTAB decisions preclude MDOR's assigning PWI basements a separate income-producing value under the income approach.

¶88 We begin, as we must, with the plain language of Admin. R. M. 2.51.307(4), an MTAB rule promulgated pursuant to its § 15-2-201, MCA, rule-making authority.[26] We give agency interpretations of their own administrative rules deference unless "plainly inconsistent with the spirit of the rule." *Mayer v. Bd. of Psychologists*, 2014 MT 85, ¶ 25, 374 Mont. 364, 321 P.3d 819. Rule 2.51.307(4) provides:

> With respect to taxable real property and improvements thereon, the decision of a county tax appeal board shall be final and binding unless reversed or modified upon review by the Montana Tax Appeal Board. If the decision, of the county tax appeal board is not reviewed by the Montana Tax Appeal Board, it shall be final and binding on all interested parties for all subsequent tax years unless there is a change in the property itself or circumstances surrounding the property which affect its value. Statutory reappraisal by the Department of Revenue pursuant to 15-7-111, MCA, is a circumstance affecting the value of real property and improvements thereon.

¶89 We agree with MTAB in one respect: the 2022 CTAB decisions did not freeze PWI's assessed value for all future tax cycles. Real property is subject to periodic reappraisal, and Rule 2.51.307(4) expressly recognizes that statutory reappraisal may be a circumstance affecting value. But MTAB read the rule too broadly. If statutory reappraisal alone automatically reopened every issue decided by an unappealed CTAB decision, the rule's finality language would do little work.[27] A CTAB decision otherwise "final and

---

[26] The rule implements §§ 15-2-201, -301, and 15-15-103, MCA. MTAB changed the rule, including by adding the last sentence, in 1988. Mont. Admin. Reg. Notice No. 2-2-171, pp. 154-55 (Jan. 28, 1988).

[27] We have only considered Admin. R. M. 2.51.307(4) once before, and not directly. *See Hanley v. Dep't of Revenue*, 207 Mont. 302, 673 P.3d 1257 (1983) (declining to reach taxpayers'

binding on all interested parties for all subsequent tax years" would cease to be final or binding simply upon the next statutory reappraisal. The better reading gives effect to both parts of the rule: an unappealed CTAB decision remains final and binding as to issues actually decided unless there is a change in the property itself or in circumstances surrounding the property that affects the prior determination. We note, too, that any MTAB decision not reviewed, reversed, or modified by a district court on judicial review would also never be final. Admin. R. M. 2.51.403(2) (2023) imposes identical requirements on decisions of the Montana Tax Appeal Board and creates an identical exception to their finality.[28]

¶90    Properly framed, the question is not whether MDOR may ever recognize basement space in valuing commercial condominium property. The question is narrower: whether MDOR identified any change in PWI's basement access, fire-code status, lease treatment, rental use, or other circumstance affecting the 2022 CTAB determination that the basements could not be assigned separate income-producing value under the income approach. Simply reappraising the property every tax cycle cannot defeat the finality of a fully adjudicated CTAB decision under Rule 2.51.307(4); there must be a change which affects value. There was no such change in this case.

---

unpreserved claim that mid-cycle reappraisal allowed MDOR to "circumvent" a CTAB decision it did not appeal, but noting that Rule 2.51.307(4) was "a restatement of the doctrine of res judicata adapted to fit the purposes of the state and county tax appeal boards").

[28] Rule 2.51.403(2) is problematic for its own reasons, including that it appears to contradict §§ 15-7-102(6) and 15-2-301(6), MCA, which place no similar limits on the finality of MTAB decisions. *See* § 2-4-305(6)(a), MCA ("a rule is not valid or effective unless it is consistent and not in conflict with the statute").

¶91    MDOR claims that "the relevant change" here overriding CTAB's 2022 decisions was "the new reappraisal cycle itself."   This claim is not borne out by the record. First, MDOR did not assert that anything actually *changed*—either to the PWI property itself or circumstances surrounding the property—between the 2021 appraisal on condominiumization and June 2023 statutory reappraisal.  Both times, MDOR appraised PWI in an identical manner, using the income approach and assigning separate PGIs for the first floors and basements.  Next, the only "change" between MDOR's June 2023 income-approach appraisal and January 2024 cost-approach appraisal was "to *property information*"—i.e., a change to the use code for PWI's basements from office to storage. Notably, MDOR made this "change" on informal review under § 15-7-102(3), MCA, not on periodic reappraisal under § 15-7-111, MCA.  And this "change" was in form only, not substance.  MDOR did not claim it changed the use code because of any actual change in use, but rather, to alleviate the taxpayers' "concerns" about how the basements were being valued under the income approach.[29]   Later taxpayer protest to valuation could not reasonably constitute "a change in the property itself" or in "circumstances surrounding the property" that would defeat the final and binding effect of CTAB's or MTAB's prior decisions under Rules 2.51.307(4) and 403(2).

¶92    MTAB's conclusion that CTAB's 2022 decisions did not preclude MDOR from valuing PWI basements was error.  Statutory reappraisal may indeed constitute a change in circumstances surrounding the property which affect its value.  But that was not the case

---

[29] MTAB likewise found MDOR had changed the basement use code only "to address the taxpayers' concerns."

here. MDOR did not show any actual change to the PWI property or circumstances surrounding it that would exempt the unchallenged CTAB decisions from finality under Admin. R. M. 2.51.307(4). Therefore, CTAB's 2022 decisions that MDOR may not separately assess PWI unit basements under the income approach remain "final and binding on all interested parties," including MDOR, "for all subsequent tax years."

¶93 MDOR complains that upholding CTAB's unappealed 2022 decisions effectively "exempts" PWI basements from taxation in violation of constitutional principles and mandates. First, MDOR agrees that the basements have no separate income-producing value. Implicit in CTAB's 2022 decision to adopt O'Brien's first-floor-only PGI was that it appropriately captured the basements' values for taxation purposes.[30] PWI's basements are thus not exempt from taxation under CTAB's decisions; their taxable value is captured in PWI's rental income.

¶94 Second, we do not read Rule 2.51.307(4) so narrowly as to forever preclude MDOR's separately assessing PWI's basements. CTAB's 2022 decisions remain binding on MDOR unless and until something changes in the nature of PWI's basements or circumstances surrounding the property that affects their value. At that point in time, CTAB's decisions will no longer be final and binding under Rule 2.51.307(4). Until then, those decisions control.

¶95 *4. Whether "sufficient, relevant information on income" was "made available to the department" under § 15-8-111(5), MCA.*

---

[30] CTAB articulated exactly this rationale in its 2024 of-record deliberations on the identical issue for the following tax cycle.

41

¶96 The threshold dispositive question in this case has always been whether MDOR had "sufficient, relevant information on income" available. If yes, it had to use the income approach to valuation. If not, it had to use the cost approach. Nothing in the plain language of § 15-8-111(5), MCA, gives MDOR discretion to choose between those approaches once the statutory condition is satisfied. Section 15-8-111(5), under its plain language, leaves room for professional judgment in determining whether the information made available is sufficient and relevant. But it does not permit MDOR to substitute a preferred valuation method after sufficient, relevant income information has been made available.

**O'Brien satisfied § 15-8-111(5)'s "sufficient, relevant information on income" requirement**

¶97 It is undisputed that PWI Units 130, 132, and 136 are commercial condominium units and class four commercial properties subject to individual assessment. Sections 15-6-134, 15-8-511, 15-1-101(1)(d)(i), MCA.

¶98 Section 15-8-111, MCA, mandates that "[a]ll taxable property must be appraised at 100% of its market value except as otherwise provided," including class four properties described in § 15-6-134, MCA. Section 15-8-111(1), (8)(d), MCA. "Market value is the value at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Section 15-8-111(2)(a), MCA.

¶99 As pertinent,

[i]n valuing class four residential and commercial property described in 15-6-134, the department shall conduct the appraisal following the appropriate uniform standards of professional appraisal practice for mass appraisal promulgated by the appraisal standards board of the appraisal

42

foundation. In valuing the property, the department shall use information available from any source considered reliable. Comparable properties used for valuation must represent similar properties within an acceptable proximity of the property being valued.

Section 15-8-111(3)(a), MCA. "Comparable properties" are those that have "similar use, function, and utility; [are] influenced by the same set of economic trends and physical, governmental, and social factors; and [have] the potential of a similar highest and best use." Section 15-1-101(1)(e), MCA.

¶100 "The department may not adopt a lower or different standard of value from market value in making the official assessment and appraisal of the value of property, *except*, . . . *for condominium property*, the department shall establish the value as provided in subsection (5)." Section 15-8-111(4)(b)(i), MCA (emphasis added).

> [I]f sufficient, relevant information on income is made available to the department, the department *shall* use the income approach to appraise commercial condominium units. Because the undivided interest in common elements contributes directly to the income-producing capability of the individual units, the department is not required to separately allocate the value of the common elements to the individual units being valued.

Section 15-8-111(5)(b), MCA (emphasis added). Conversely,

> [i]f sufficient, relevant information on income is not made available for commercial condominium units, the department *shall* value condominiums using the cost approach. When using the cost approach, the department shall value the units individually and allocate only the common area elements to the units based on the percentage of undivided interest in the condominium declaration.

Section 15-8-111(5)(c), MCA (emphasis added). *See also* § 15-8-511, MCA.

¶101 Section 15-8-111(5), MCA, does not define "sufficient" or "relevant" "information on income" or how that information "is made available to the department." The rest of

43

§ 15-8-111 gives little insight into what might meet this standard, other than by requiring MDOR, when appraising, to follow uniform mass appraisal standards, "use information available from any source considered reliable," and consider "comparable properties." Section 15-8-111(3)(a), MCA.

¶102   Where a statutory term is undefined, we read it to have its plain and ordinary meaning. *Giacomelli v. Scottsdale Ins. Co.*, 2009 MT 418, ¶ 18, 354 Mont. 15, 211 P.3d 666. "Relevant" means "bearing upon or properly applying to the matter at hand," i.e., pertinent. *Relevant*, Webster's Third New International Dictionary, Unabridged (2021) (Webster's). "Sufficient" means "a quantity or scope that meets the demands of a specific situation," i.e., enough or adequate. *Sufficient*, Webster's. "Available" is "that which is accessible or may be obtained." *Available*, Webster's. Plainly, then, MDOR must use the income approach to appraise commercial condominium units when it has or can obtain enough pertinent information to establish an income value for those condo units.

¶103   While § 15-8-111, MCA, generally references uniform standards for mass appraisal, nothing in the plain language of § 15-8-111(5)(b) or (c), MCA, states that the income information MDOR receives must be relevant or sufficient to build a mass-appraisal income model for that property type, or that the information must be available to MDOR exclusively through its county or regional data pools. MDOR's witnesses testified that the department's data pools are compiled from income and expense information voluntarily submitted by property owners. But if property owners never elected to submit data, no pool or model could ever be made, and MDOR could therefore *always* use the cost approach to value an income-producing property even where there were comparable

44

properties in the market, so long as it lacked model data. That construction adds a limitation the Legislature did not include; § 15-8-111(5) makes no mention of model data or income data pools.[31] Therefore, MDOR's claim that the presence of only one non-comparable commercial condo in its Kalispell data pool necessarily meant it lacked "sufficient, relevant information on income" is not supported by the plain language of § 15-8-111(5), MCA.

¶104 Conversely, the income information O'Brien provided to MDOR was "sufficient" and "relevant" under a plain reading of § 15-8-111(5), MCA. O'Brien provided rent data for four of the five PWI units for the relevant 2021 time period. And O'Brien provided rent data for the seven units in the nearly-identical PWII next door. This rent information was supported by Jeff and Ken O'Brien's CTAB and MTAB testimony. It was also separately supported by Green's affidavit, which confirmed PWII's average rent rates, established that Green set those rents competitive to the Kalispell market, and showed that all PWII units were rented, like PWI units, with basement use included in the rent. The simple fact that PWII is a mirror-image of PWI, built at the same time, from the same plans, and with the same materials; is located just feet away; and rents its units under the same terms as PWI shows that PWII is a comparable property, as that term is defined in §§ 15-8-111(3)(a) and 15-1-101(1)(e), MCA. In short, O'Brien provided income information for the taxpayers' property *and* a comparable property.

---

[31] *Compare* Admin. R. M. 42.20.108(7) ("*depending on data availability*, the department *may* develop income models for various income use groups" (emphasis added)).

¶105 MDOR's own administrative rule supports this reading of § 15-8-111(5), MCA. Rule 42.20.108 is MDOR's income-approach formula. As pertinent, the rule defines income as "the typical property net income, which shall reflect *market rents* . . . for the type of properties being appraised." Admin. R. M. 42.20.108(1)(b) (emphasis added). "Market rent is the rent that is *justified for the property* based on an analysis of *comparable rental properties*, and upon *past*, *present*, *and projected future rent of the subject property*. It is not necessarily contract rent, which is the rent actually paid by a tenant." Admin. R. M. 42.20.108(2) (emphasis added). In short, this rule requires an income value to reflect "market rents," which are ascertained upon analysis of *comparable rental properties* and actual rents of the *subject property*. O'Brien's income information met this standard.

¶106 Nevertheless, MDOR rejected O'Brien's income information as insufficient to establish a PGI for PWI units because it was not independently verifiable; it was the product of bad management practices like renting below market to friends and family; it was "below market"; and it could not be corroborated by PWII rents because PWII did not answer MDOR's request for income/expense data and was in any event not actually a comparable property.

¶107 Nothing in the plain language of § 15-8-111(5), MCA, requires income information to be "independently verifiable"—either by written rental agreements, by tax returns, or by income information from comparable properties within the data pool. Notwithstanding, O'Brien's rent information was verified in this case—by Ken and Jeff O'Brien's sworn testimony and Green's sworn affidavit. And, despite Pritchard's blanket assertion that

O'Brien's PGI was the result of bad management practices, MDOR did not establish that anyone besides Jeff O'Brien was a friend of or family to PWI unit owners. MDOR also did not refute Jeff's testimony that his Unit 130 rent was comparable to other office rents he paid and to rent rates actually charged for PWI and PWII units, i.e., that he did not receive any "sweetheart deal."

¶108 MDOR also did not establish beyond mere assertion how O'Brien's "rent rates were below market" or below what MDOR "had typically seen for commercial properties." By its own admission, MDOR had no income data for comparable commercial condos in Kalispell—there was nothing comparable in the data pool. MDOR also could not and did not provide the taxpayers with any evidentiary basis for the PGI values it used in its June 2023 appraisal or showed the taxpayers in its property record cards on reappraisal in January 2024. It is unclear, then, how Pritchard could testify with any authority that O'Brien's PGI was inconsistent with or below market rents. Pritchard's testimony on that point, instead, was unsupported and contradicted by the record, including Ken and Jeff O'Brien's testimony, Green's affidavit, and MDOR's own admissions.

¶109 Finally, MDOR's claim that PWII was not actually a comparable property because not condominiumized is of no avail. MDOR's Cordone testified that the condominiumization distinction affected only the properties' respective market values—PWII's building was valued as a whole and PWI's units were valued individually. Notwithstanding, she also admitted that PWI and PWII could nonetheless still "garner . . . the same market rent." Nothing in §§ 15-8-111(3)(a) or 15-1-101(1)(e), MCA, requires a comparable property to be "identical" to the subject property; nor do those

sections require a comparable property to have the same market value as the property being assessed.

¶110 This brings us to MDOR's market value argument. MDOR insists that it could not use O'Brien's income information because it resulted in an assessed value at half of market value, which MDOR knew precisely from the 2021 sales of Units 126 and 128. True, § 15-8-111, MCA, generally mandates that taxable property be assessed at 100% market value. But the same statute also contains a specific valuation directive for condominium property. Section 15-8-111(4)(b)(i), MCA, provides that condominium property must be valued "as provided in subsection (5)," and subsection (5) mandates the income approach when sufficient, relevant income information is made available. Thus, MDOR could not reject income information satisfying § 15-8-111(5)(b), MCA, solely because the resulting income-approach value did not match the 2021 sale prices of Units 126 and 128. To hold otherwise would allow the general market-value requirement to override the specific commercial-condominium valuation method the Legislature prescribed in § 15-8-111(5), MCA. *See* §§ 1-2-101, -102, MCA.

**The "validity and reliability" of Jeff O'Brien's appraisal**

¶111 Finally, we address MDOR's claim and MTAB's conclusion that O'Brien's income-approach appraisal was not valid or reliable because Jeff O'Brien was not a certified appraiser; the appraisal was performed more than six months after the valuation date; and the appraisal mixed actual property information and MDOR model data. MDOR, CTAB, and MTAB must consider a taxpayer's independent appraisal if it meets Montana's Board of Real Estate Appraisers' standards and was completed within six

48

months of the valuation date. Sections 15-7-102(3)(e), 15-15-103(3), 15-2-301(3)(a), MCA. But nothing in these statutes requires MDOR, CTAB, or MTAB to use the taxpayer's appraisal to value the property. Therefore, Jeff's qualifications and the timing of the appraisal bear only on whether the taxing or reviewing body was required to consider the appraisal in the first place. Regardless, MDOR, CTAB, and MTAB all expressly considered Jeff's appraisal. The parties' arguments on this point therefore do not resolve the statutory question before us.

¶112 As for O'Brien's blending of actual and model data producing a purportedly "unreliable" overall property value, Jeff's appraisal methodology was not dispositive to the § 15-8-111(5), MCA, inquiry. The statute requires "sufficient, relevant *information on income*," not a flawless application of MDOR's income-approach formula performed by a board-certified appraiser. Defects in the taxpayers' appraisal could bear on the final valuation CTAB assigned, and MTAB was entitled to consider those defects when weighing the evidence. But appraisal defects do not answer the antecedent statutory question. The pertinent question at the threshold stage was whether MDOR had sufficient, relevant *income information*; not whether O'Brien's appraisal was perfect, produced a valuation below the two 2021 sale prices, or should be adopted without adjustment.

¶113 By MDOR's own admissions, it possessed model data for every value in the Rule 42.20.108 income-approach calculation except model income data. O'Brien provided income information. Though MDOR claimed O'Brien's information was not sufficient or relevant to trigger § 15-8-111(5)(b), MCA, that claim was based on MDOR's reading the statute to require more than it does by its plain terms. Income information, under the

49

statute, does not have to be available only through MDOR's county or regional data pools, or be relevant or sufficient to build a mass-appraisal income model or to assess the subject property at 100% market value.

¶114 We hold that O'Brien's PWI and PWII income information satisfied the § 15-8-111(5)(b) standard and that "sufficient, relevant information on income" was thus "made available to the department." MDOR was therefore required under § 15-8-111(5)(b) to use the income approach to appraise PWI's commercial condominium units. MTAB's contrary conclusion that MDOR lacked sufficient, relevant income information because there was only one, non-comparable commercial condo in its Kalispell data pool was erroneous. That conclusion treated the absence of model data as dispositive, even though § 15-8-111(5), MCA, does not make model-data sufficiency the statutory test. We now turn to whether MTAB correctly reversed CTAB's April 2024 decisions adopting O'Brien's income-approach valuations.

¶115 *5. Whether MTAB correctly reversed CTAB's decision.*

¶116 MTAB reversed CTAB and adopted MDOR's cost-approach valuations upon concluding that:

(1) "Because MDOR performs mass appraisals, they cannot use a property's actual income and expense data to value that property."

(2) "If MDOR does not receive sufficient information to value a particular commercial property using the income approach, which can happen when there are not enough voluntary submissions of data to develop a model, MDOR must value the property using the cost approach."

(3) "If MDOR receives sufficient income information from voluntary submissions in a future cycle, [it] may value [PWI] using the income method."

50

(4) "Because MDOR only received income information from one commercial condominium during the 2023/24 valuation cycle, we believe MDOR correctly valued the property using the cost approach."

These conclusions were erroneous.

¶117 Section 15-8-111, MCA, does not expressly forbid MDOR from assessing a property based on that property's specific income and expense information. One of MDOR's counterarguments is that its use of a mass-appraisal system forecloses any property-specific assessments; Cordone testified that individually assessing properties is prohibitive and inequitable. But the pertinent statutes and MDOR's own administrative rule bely that claim. Nothing in § 15-8-111(5) says income information "cannot" be property-specific. Conversely, § 15-7-102, MCA, provides that (1) on informal review, MDOR may consider "other relevant information presented by the taxpayer in support of the taxpayer's opinion as to the market value of the property"; and (2) on appeal to CTAB or MTAB, those boards may consider "other relevant information presented by the taxpayer as evidence of the market value of the property." Section 15-7-102(3)(e), (6), MCA. MDOR, CTAB, and MTAB are also required to consider a taxpayer's independent appraisal of the subject property under certain circumstances. Sections 15-7-102(3)(e), 15-15-103(3), 15-2-301(3)(a), MCA. When appraising, MDOR "shall use information available from *any source* considered reliable." Section 15-8-111(3)(a), MCA (emphasis added). And Admin. R. M. 42.20.108 defines "market rent" as "rent that is justified for the property based on an analysis of comparable rental properties, and upon past, present,

and projected future rent *of the subject property*."[32]  These rules reflect that, in determining value, MDOR may in fact consider property-specific information provided by the taxpayer in support of the taxpayer's valuation in context of the comparable market.

¶118  Section 15-8-111(5), MCA, also does not provide that sufficient, relevant income information must consist of "voluntary submissions of data" sufficient "to develop a model" or of more than one commercial condo in a data pool.  For reasons explained above, just because MDOR in the ordinary course assesses property using mass-appraisal models, it does not follow that it *must* or that when it lacks model data, it lacks "sufficient, relevant information on income."  If the Legislature intended § 15-8-111(5), MCA, to reflect MDOR's mass-appraisal modelling practice for valuing commercial condominiums, the plain language does not succeed in evidencing that intent.  *See also* 2005 Mont. Laws ch. 379 (adding subsection (5)).

¶119  MTAB's conclusion that "if" MDOR receives enough voluntary submissions in the future, it "may value" using the income approach is also contrary to law.  Section 15-8-111(5), MCA, is not permissive.  "[I]f sufficient, relevant information on income is made available to the department, the department *shall* use the income approach to appraise commercial condominium units."  Section 15-8-111(5)(b), MCA (emphasis added).  MDOR "*shall*" use the cost approach only "if sufficient, relevant information on income

---

[32] In accordance with this rule, MDOR instructed O'Brien that: "Property owners must be prepared to present detailed information about their property, including rental income, operating expenses, lease agreements, and income statements for the department to consider any adjustments to value.  The department may use this income and expense data to value your property if the data reflects typical market conditions."  MDOR's CTAB Exhibit B, pp. 13-14.

is not made available for commercial condominium units." Section 15-8-111(5)(c), MCA.[33] Nothing in these statutes authorized MDOR, as it did here, to "*select* the cost approach," even if it alleviated taxpayer concerns; it produced an assessed value that best reflected the sale prices of comparable properties; it best reflected the subject property's use; or it was "the most appropriate and defensible approach to valuation."

¶120 MDOR's witnesses testified that, after two consecutive taxpayer objections to MDOR's 2021 and 2023 income-approach assessments, MDOR switched valuation methods to overcome the taxpayers' "concerns" about separately valuing PWI's basements. Based on this testimony, MTAB found that MDOR "*decided to*" switch methods "based *partly on the taxpayers' concern* that the basement[s were] being overvalued on the income approach *and* because MDOR did not receive sufficient income information to use the income approach." (Emphasis added.) Despite acknowledging MDOR's admitted dual purpose for using the cost approach, MTAB concluded only that MDOR used the cost approach when it "only received income information from one commercial condominium during the 2023/24 valuation cycle." MTAB therefore misapprehended the effect of substantial record evidence that MDOR in part used the cost approach to alleviate taxpayer concerns. *Flathead Lakers*, ¶ 34. Section 15-8-111(5),

---

[33] Compare § 15-8-111(5)(b)-(c), MCA, with MDOR's Admin. R. M. 42.20.105(3) (2025), which provides that "the income approach is used to value commercial condominium units when reliable income and expense data is available and the common elements of commercial condominiums are included in individual unit values. When reliable income and expense data is not available, the cost approach *may* be used." (Emphasis added.)

MCA, does not authorize deviation from the mandatory income approach when taxpayers are concerned about valuations under that method.

¶121 Regarding "comparable sales," MTAB separately concluded that O'Brien's valuation did not meet the § 15-8-111(5), MCA, standard because it resulted in a value below the 2021 sale prices for Units 126 and 128, and that MDOR correctly used those sale prices to support its cost-approach appraisal. Dissatisfied with O'Brien's $12.59 PGI because, when plugged into MDOR's Rule 42.20.108 formula, it resulted in a total assessed value at half the 2021 sale prices, MDOR "selected the cost approach" because it "came right in line" with those sale prices. But § 15-8-111(5) does not authorize deviating from the income approach where the cost approach produces a value more "in line" with comparable sales. Sales information may be used in appropriate ways within MDOR's valuation process, including to develop capitalization rates or validate results. But it cannot replace the statutory trigger mandating application of a specific valuation method for commercial condominium units.

¶122 Finally, MTAB's conclusion that there was only one other non-comparable commercial condo in the Kalispell data pool and so MDOR lacked model income data for that property type was ultimately not dispositive of the § 15-8-111(5), MCA, inquiry. MTAB and MDOR overread § 15-8-111(5) to require that "sufficient, relevant information on income" be income information sufficient to build a mass-appraisal income model; that income information cannot be property-specific; that income information must be independently verifiable against comparable properties in MDOR's data pool; and that

income information is only sufficient and relevant if it produces an assessment equal to 100% of market value. But none of these requirements exist in § 15-8-111(5), MCA.

¶123 By its plain language, § 15-8-111(5), MCA, requires only that MDOR has enough pertinent information to establish an income value for the subject commercial condo. Contrary to MDOR's assertions that assessing a property based on property-specific data is unfeasible or creates an inequity, that is not what actually happened here.[34] O'Brien did not ask MDOR to consider PWI rents in a vacuum; the taxpayers also provided rent values negotiated under similar terms in the nearly-identical PWII next door. MDOR's claim that PWI rents were the product of bad management practices was not borne out by substantial record evidence; it was an allegation only and refuted by PWII's comparable rent information. Nor was MDOR's claim that PWII was not a comparable property because it was not condominiumized dispositive; Cordone admitted that PWI and PWII could garner the same market rent notwithstanding their different market values. MDOR claimed that O'Brien's first-floor PGI did not capture the basements' inherent value as storage space, but MDOR offered no evidence to refute Green's affidavit statements that PWII unit rents incorporated use of the basements, mostly for storage, just like PWI's. The record therefore supports CTAB's determination that the taxpayers' income information was relevant to market rent, even if MDOR disputed the ultimate valuation that information produced.

---

[34] We note, too, that MDOR's arguments on this point were irreconcilable: MDOR complained that O'Brien's income valuation was not independently verifiable with property-specific tax returns or lease agreements, but then simultaneously insisted that MDOR could not individually value the taxpayers' property with property-specific information.

¶124 At CTAB first, and then again at MTAB, MDOR enjoyed a presumption that its cost-approach assessment was correct. O'Brien bore the burden to rebut that presumption. CTAB concluded that O'Brien had done so by providing income information sufficient to meet the § 15-8-111(5), MCA, standard triggering mandatory application of the income approach. Then, comparing MDOR's June 2023 income-approach appraisal to O'Brien's income-approach appraisal, CTAB chose the most appropriate valuation based on the record evidence. O'Brien's $12.59 PGI was the highest of PWI rents; the PGI was perfectly corroborated by rents from the nearly identical PWII, which rented similar units with similar first-floor/basement configurations under similar terms for similar rent amounts; and the PGI did not appear to be the product of any sweetheart deal for friends and family. In contrast, MDOR's $5.50 basement PGI was not appropriate based on party consensus that the basements had no separate income-producing value and its $14.75 first-floor PGI was not supported by any record evidence and, based on unrefuted testimony, likely the product of comparable sales, and not comparable *rents*, as Admin. R. M. 42.20.108 explicitly requires. On this record, CTAB's acceptance of O'Brien's income-approach valuation was not arbitrary or unsupported.

¶125 MTAB reached a contrary threshold conclusion. Though its findings that there was only one non-comparable commercial condo in the Kalispell data pool and that MDOR had not received sufficient voluntary submissions to build an income model were supported by substantial evidence, the record reflects that MTAB misapprehended the effect of that evidence as definitively establishing that "sufficient, relevant information on income" was not "made available to the department" and so MDOR correctly used the cost approach.

56

This conclusion, in turn, was based on an erroneous interpretation and application of § 15-8-111(5), MCA. We hold that MTAB's decision to reverse CTAB and adopt MDOR's cost-approach appraisal on these grounds was the product of legal error.

¶126 We recognize that remand ordinarily may be appropriate when an agency applies an incorrect legal standard. Remand is unnecessary here. CTAB resolved the valuation dispute under the correct statutory approach after hearing the parties' evidence. MTAB reversed because it treated the absence of MDOR model data, and its criticisms of O'Brien's appraisal, as sufficient to relieve MDOR of the statutory obligation to use the income approach. Once those legal errors are corrected, the record leaves no legally sufficient basis for MDOR to use the cost approach for the 2023/24 cycle. O'Brien made income information available for the subject PWI units and the adjacent PWII building; the evidence showed the buildings were substantially similar for rental purposes; the rents included basement use; and MDOR did not identify any reliable rental data supporting a higher PGI or separate income-producing value for the basements. We therefore reinstate CTAB's 2024 decisions not because we independently reweigh valuation evidence, but because CTAB's income-approach valuation was supported by substantial evidence and MTAB's contrary decision rested on legal error.

¶127 Accordingly, we reverse the District Court's July 15, 2025 order affirming MTAB's February 2025 decisions, reverse MTAB's February 2025 decisions, and reinstate CTAB's April 2024 decisions ordering MDOR to assess O'Brien's PWI Units 130, 132, and 136 using O'Brien's income-approach valuation.

57

**CONCLUSION**

¶128   We hold that MTAB did not improperly consider the validity and reliability of O'Brien's appraisal for the first time on appeal because those matters were encompassed within the valuation dispute presented to CTAB.  We further hold that MTAB correctly denied O'Brien's motion for summary judgment because factual issues remained regarding the sufficiency, relevance, and weight of the income information made available to MDOR.

¶129   We clarify, however, that MTAB's authority on appeal from a county tax appeal board under § 15-2-301, MCA, permits MTAB to supplement the record and hear further testimony, but does not permit MTAB to conduct the same kind of unrestricted "trial de novo" authorized in direct appeals from MDOR assessment decisions under § 15-2-302, MCA, where no county-board contested-case record has been developed.

¶130   On the merits, MTAB incorrectly construed Admin. R. M. 2.51.307(4) and § 15-8-111(5), MCA.  The 2022 CTAB decisions did not freeze PWI's assessed value for all future tax cycles, and Rule 2.51.307(4) expressly recognizes that statutory reappraisal under § 15-7-111, MCA, may be a circumstance affecting value.  But statutory reappraisal alone did not allow MDOR to disregard the unchanged factual predicate underlying the 2022 CTAB decisions:  the basements lacked separate access, did not comply with fire-code requirements for separate rental use, and were rented, if at all, only as part of the first-floor office space.  MDOR identified no change in access, fire-code status, lease structure, separate rentable use, or income-producing capacity that would support assigning the basements a separate PGI under the income approach.

¶131 Further, MTAB erroneously treated the absence of sufficient MDOR model data as dispositive under § 15-8-111(5), MCA. Section 15-8-111(5) does not require income information sufficient to build a mass-appraisal income model, does not exclude property-specific income information, does not require independent verification against comparable properties already in MDOR's data pool, and does not require the income approach to produce a value matching the 2021 sale prices of Units 126 and 128. The statute asks whether "sufficient, relevant information on income" was "made available to the department." Section 15-8-111(5)(b), MCA. Likewise, Admin. R. M. 42.20.108 recognizes that income information may come from sources beyond periodic voluntary submissions, including taxpayer submissions on informal reviews and formal appeals. Because sufficient, relevant income information was made available to MDOR, MDOR was required to use the income approach.

¶132 Accordingly, we affirm the District Court's July 15, 2025 order to the extent it concluded MTAB could consider the validity and reliability of O'Brien's appraisal and correctly affirmed MTAB's denial of O'Brien's motion for summary judgment. We reverse the District Court's order to the extent it affirmed MTAB's February 2025 merits decisions adopting MDOR's cost-approach valuations. We reverse MTAB's February 2025 merits decisions and reinstate CTAB's April 2024 decisions for Units 130, 132, and 136. Pursuant to CTAB's April 2024 decisions, MDOR is ordered to assess PWI Units 130, 132, and 136 for the 2023/24 tax cycle using O'Brien's income-approach valuations as described in O'Brien's October 2023 appraisal, Exhibit 15, and as adopted by the Flathead County Tax Appeal Board. We do so because MTAB applied an erroneous

59

legal standard under § 15-8-111(5), MCA, misapprehended the effect of the income information made available to MDOR, and reversed a CTAB valuation supported by substantial evidence under the correct statutory approach.

¶133 Affirmed in part, reversed in part, and remanded for implementation of CTAB's April 2024 decisions consistent with this Opinion.

/S/ KATHERINE M. BIDEGARAY

We Concur:

/S/ CORY J. SWANSON
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON
/S/ JIM RICE

Justice Jim Rice, concurring.

¶134 I concur with the Court's holding and appreciate the yeoman's effort to untangle the complexities of this taxation matter to ensure the law is properly applied.

¶135 Admin. R. M. 2.51.307(4) (2023) is, at worst, internally contradictory, or at best, swallowed by its exception. The Rule states twice that a county board's decision is "final and binding" unless it is reversed on appeal by MTAB, and provides that the binding effect is "on all interested parties for all subsequent tax years unless there is a change in the property itself or circumstances surrounding the property which affect its value." However, the Rule continues by stating that statutory reappraisal by the Department is such "a circumstance affecting the value of real property" that is excepted from the Rule's final and binding effect.

60

¶136 It is lost on me how a reappraisal can possibly constitute a change to the property itself or be considered a circumstance affecting the property's value. A reappraisal can certainly *report* a property's current market value, and thus reflect how a property's value has changed since the prior appraisal, but it is not the *cause* of the change in property value, and cannot itself be "a circumstance affecting the value of real property," except by administrative *ipse dixit*. The plain language thus makes no sense, and the Department's argument on that basis would defeat in every case the Rule's earlier-stated final and binding effect "for all subsequent tax years." The Court notes that if "reappraisal alone automatically reopened every issue decided by an unappealed CTAB decision, the rule's finality language would do little work," Opinion, ¶ 89, and indeed, perhaps do no work, illustrating the contradictory nature of the Rule. The Court resolves this problem by concluding, from a reading of the Rule's language as a whole, that something more than reappraisal is necessary to defeat the final and binding effect of the Rule, that is, there must be "a change in the property itself or in circumstances surrounding the property that affects the prior determination," or "a change which affects value." Opinion, ¶¶ 89, 90.

¶137 I agree with the Court's rendering of the Rule but would also apply the Rule's preclusive effect to the income-approach valuation of the subject property approved by the 2022 CTAB decision. The Court, albeit in *dicta*, states the 2022 CTAB decision would have "no preclusive effect on *cost-approach* valuations," Opinion, ¶ 87 (emphasis in original). In my view, because income-approach valuation was a factor encompassed in the 2022 CTAB decision, and is thus within "every issue decided by an unappealed CTAB decision," Opinion, ¶ 89, it must also receive the same preclusive effect as the other

61

factors in the valuation determination. "[I]f sufficient, relevant information on income is made available to the department, the department shall use the income approach." Section 15-8-111(5)(b), MCA. CTAB determined in 2022 that sufficient relevant information was available to use the income approach to value this property, and the Department did not appeal that CTAB determination. Without preclusive effect, the Department may, as O'Brien contends occurred here, attempt to evade the Rule altogether by pursuing a cost-approach valuation. "[T]ax statutes are to be strictly construed against the taxing authority and in favor of the taxpayer." *Omimex Can., Ltd. v. State*, 2008 MT 403, ¶ 21, 347 Mont. 176, 201 P.3d 3 (citing *Western Energy Co. v. Dep't of Revenue*, 1999 MT 289, ¶ 10, 297 Mont. 55, 990 P.2d 767 ("when a taxing statute is susceptible to two constructions, doubt should be resolved in the favor of the taxpayer")). Consequently, I believe the Department would be burdened to demonstrate that something had changed since the 2022 CTAB decision, beyond the mere fact of a subsequent reappraisal, to undermine the determination made therein that sufficient information was available for an income-approach valuation. Nonetheless, I concur with the Court's determination here that sufficient information was indeed available for use of the income-approach valuation in this reappraisal cycle.

/S/ JIM RICE

62